IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

HOLLY L. ALTITONANTE,

      Plaintiff,

   v.

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 07-5540 (JBS)

**OPINION**

APPEARANCES:

Robert A. Petruzzelli, Esq.
JACOBS, SCHWALBE & PETRUZZELLI, P.C.
Woodcrest Pavilion
Ten Melrose Ave., Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Christopher J. Christie
UNITED STATES ATTORNEY
    By:  Andreea Lechleitner
        Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE**, District Judge:

    This matter comes before the Court pursuant to Section

205(g) of the Social Security Act ("the Act"), as amended, 42

U.S.C. § 405(g), to review the final decision of the Commissioner

of the Social Security Administration ("Defendant") denying the application of Claimant Holly L. Altitonante ("Claimant") for Disability Insurance Benefits ("DIB") under Title II of the Act. See 42 U.S.C. §§ 401-34.  This Court must determine whether the decision of Administrative Law Judge ("the ALJ"), Mark G. Barrett, that Claimant was not disabled within the meaning of the Act between September 1, 2000 and her date last insured of December 31, 2001, is supported by substantial evidence.

Claimant brings two challenges, arguing that the ALJ: (1) failed to properly determine her residual functional capacity ("RFC"); and (2) failed to properly infer the onset date regarding Claimant's mental impairment pursuant to Social Security Ruling 83-20.  For the reasons set forth below, the Court agrees with Claimant, and will accordingly vacate the Commissioner's decision and remand to the ALJ to reconsider his reasoning in accordance with the guidance set forth herein.

I.   **BACKGROUND**

A.   **Procedural History**

Claimant filed an application for DIB under the Act on January 3, 2003, alleging that she was disabled as a result of arthritis, depression, anxiety, and back, neck, elbow, knee and ankle pain, as well as migraine headaches.  (R. at 47-48, 74, 108-09.)  Claimant's application was denied initially and upon

2

reconsideration. (R. at 201-05.)  Claimant subsequently filed a timely request for an Administrative Hearing on August 3, 2004. (R. at 219.)  The hearing was held on May 6, 2005 before ALJ Mark G. Barrett.  (R. at 33-86.)  The ALJ issued a decision on August 19, 2005, ruling that the Claimant was not disabled.  (R. at 185-97.)

Claimant successfully filed a Request for Review by the Appeals Council on August 25, 2005 resulting in the case being remanded back to the ALJ in order to evaluate the severity and functional effects of Claimant's obesity.  (R. at 199, 245-47.) A Remand Hearing was held on May 8, 2006.  (R. at 87-153.)  A Supplemental Hearing was held on March 14, 2007.  (R. at 154-82.) On June 13, 2007 the ALJ issued a decision denying Claimant's application for DIB, and Claimant's subsequent Request for Review by Appeals Council, filed on June 28, 2007, was denied as well. (R. at 8-10, 14-26, 504-06.)

Claimant's present action was filed before this Court on December 3, 2007, seeking reversal of the Commissioner's determination and an award of benefits, or, in the alternative, a remand for a new hearing.

3

**B.   Evidence in the Record**

     1.   <u>Plaintiff's Testimony on May 6, 2005 and May 8, 2006</u>

Claimant, Holly Altitonante, was born on January 18, 1959, is married, and was married in 2000-01.  (R. at 100.)  Claimant testified that she received a GED and attended Camden County Community College for about a year and a half, where she earned 41 credits.  (R. at 41, 102.)  Claimant further testified that she has a 17-year-old daughter and a 10-year-old son, who presently reside with her.  (R. at 100-01.)

Claimant's recent employment history primarily consists of six employers: (1) Dr. P. Pilla (1986-88), (2) Dr. Mark Ricigliano (1991-94), (3) A-B-T Security, Inc. (1999), (4) Davis Group, Inc. (1999-2000), (5) Charming Shoppes, Inc. (2001-02), and (6) Bag Lady (2004).  (R. at 309-11, 110-15, 117-21.)

     a.   <u>Dr. P. Pilla</u> (1986-88)

Claimant worked as a medical assistant for Dr. P. Pilla, a general practitioner.  (R. at 110, 309.)  In this position, claimant testified to being "on her feet most of the day," performing routine medical tasks and patient interactions, including taking blood, colonoscopies, pap smears, and physical examinations.  (R. at 111.)

### b.   Dr. Mark Ricigliano (1991-94)

Claimant worked as a medical receptionist for Dr. Mark Ricigliano, also a general practitioner.  (R. at 309, 112.) Occasionally, claimant would be required to provide patient care. (R. at 52.)

### c.   A-B-T Securities, Inc. (1999)

Claimant worked for A-B-T Securities, Inc., a security company, where she would be stationed at a kiosk in a shopping mall and interact with patrons to generate sales leads for the company.  (R. at 309, 113-14.)  Generating leads involved having individuals fill out a card expressing their interest in the security product.  Claimant testified to not being required to set up the kiosk.  (R. at 113-14.)

### d.   Davis Group, Inc. (1999-2000)

Claimant worked for the Davis Group, a security company, in a capacity similar to the position at A-B-T Securities, Inc. where she would set up a table at Wal-Mart and similarly interact with patrons and collect their contact information.  (R. at 107, 310-11.) Claimant testified that if she was not "having a good day, [she] did not have to go in that day."  (R. at 107.) Claimant was laid off in 2000 due to her employer losing its contract with Wal-Mart. (Id.)

     e.   Charming Shoppes, Inc. (2001-02)

Claimant worked as a part-time sales associate during the Christmas season, November 2001-January 2002, at a retail clothier. (R. at 49, 117-18, 311.)

     f.   Bag Lady (2004)

Claimant was employed at a kiosk at a local mall that sold pocketbooks.  (R. at 311.)  This position provided claimant with flexibility comparable to that of her former position at the Davis Group.  (R. at 118-20.)

    2.   Medical Reports Prior to December 31, 2001 (Date Last Insured)

     a.   Treatment History by Dr. Mark Ricigliano – Primary Care Physician

Dr. Ricigliano has been the claimant's primary care physician since 1991.  (R. at 64.)  His treatment of Claimant was sporadic; however, treatment notes indicate that Claimant has been complaining of back pain since at least 1998 and was prescribed Prozac in 1999. (R. at 428-35, 493-504.)  In May 2000, Dr. Ricigliano prescribed Hydrocodone, noting that Claimant weighed 285 pounds and complained of severe neck pain and upper back pain.  (R. at 422.)  Records indicate that Claimant telephoned in for prescriptions refills between June 17, 2000 and January 17, 2001, the next date of an office visit. (R. 421-22.) Claimant received further prescriptions for Prozac in April and

August of 2001, and was prescribed Paxil in August 2001.  (R. at 419.) On September 17, 2001, the claimant weighed 305 pounds. (R. at 415.) Dr. Ricigliano continued to prescribe the claimant Hydrocodone throughout 2002 and in October of 2002, he prescribed Wellbutrin. (R. 401-04.)

> b.   <u>Treatment History by Dr. Lyden, D.C. -<br>Chiropractor</u>

Dr. Lyden, Claimant's treating chiropractor, first examined her on March 16, 2001 and subsequently examined her "a few times each year" through July 24, 2002.  (R. at 387.)  Dr. Lyden responded to a questionnaire regarding his treatment of Claimant, which was signed and dated February 27, 2003.  (R. at 390.) Regarding his first examination of Claimant on March 16, 2001, Dr. Lyden noted the following physical findings: (1) bilateral cervical radiculopathy into upper extremities, (2) weakness in Claimant's right arm, and (3) a left rib pain.  (<u>Id</u>.) Dr. Lyden further noted that Claimant was 5'3" tall and weighed 295 pounds at the time of the first examination.  (<u>Id</u>.)  In May or June of 2002, Dr. Lyden reported that Claimant had an exacerbation of cervical pain and allergies.  (<u>Id</u>.)  As to her then-current state in February 2003, he noted that "not having seen the [patient] in 8 months, [he] cannot state her <u>current</u> clinical status or

7

condition" and that he did not know "the reason for [her] proposed disability." (R. at 390) (emphasis original.)

### c. Treatment History by Joellyn Ross, Ph.D.

On November 13, 1998, Joellyn Ross, Ph.D., evaluated Claimant and reported a diagnosis of adjustment disorder with anxiety and depressed mood. (R. at 384.) Claimant's husband noted that she had good results from Effexor and her treatment plan called for family therapy (couple). (Id.)

### 3. Medical Reports after December 31, 2001

Because it is undisputed that December 31, 2001 is the date Claimant was last insured for DIB benefits, the parties agree that the medical records after that date are only relevant to show whether she was disabled prior to that date.

### a. Dr. R. Greenberg – Oncology and Hematology

Dr. R. Greenberg, an oncology and hematology expert, evaluated Claimant on July 9, 2002. (R. at 391-92.) It was noted that Claimant has a known history of elevated white blood cell count without associated signs or symptoms. (Id.) Dr. Greenberg noted that she complained of fatigue and back aches during the few weeks preceding this examination. (Id.) Physical examination revealed no abnormalities other than an obese abdomen and chronic 1 + venostatsis changes in the ankle. (Id.) Although Claimant's white blood cell count was high, Dr.

8

Greenberg found it compatible with her typical level and determined that his physical findings were inconsistent with a myeloproliferative or leukemic disorder.  (Id.)  On September 18, 2002, Claimant returned to Dr. Greenberg for follow-up and indicated that "she continues to feel entirely well."  (Id.)  Dr. Greenberg did indicate that laboratory studies did not suggest myelogenous leukemia and Claimant's "somewhat elevated inflammatory markers" were likely secondary to an inflammatory process.  (R. at 393.)

> b.   Dr. L. Ross, Dr. B. Gleimer – Orthopedic

Claimant was first evaluated by Regional Orthopedic Professional Association in 2005 in relation to left knee pain. Dr. L. Ross noted a hematoma but "no gross ligamentous laxity or other unusual findings."  (R. at 489-93.)  Claimant was sent for an MRI, which was performed on March 3, 2005.  (Id.)  It showed a large fluid collection anterior to the patella.  (Id.)  However, the remainder of the knee was intact.  (Id.)  The claimant was evaluated by Dr. B. Gleimer on February 1, 2006, complaining of recurrent swelling and pain.  (Id.)  Dr. Gleimer's physical examination revealed bursal effusion, local erythema and bleb formation leaking a clear serous fluid.  (Id.)  Dr. Gleimer

diagnosed Claimant as suffering from left knee bursitis[1] and sent a specimen of the fluid for culture in order to rule out early septic bursitis. (<u>Id</u>.)

c.   <u>Dr. Ricigliano</u>

Additional treatment notes from Dr. Ricigliano indicate that Claimant's elbow was swollen when he examined her on October 26, 2004.  (R. at 503.) Claimant next saw Dr. Ricigliano's office in February of 2005.  (R. at 502.)  Claimant indicated that she fell and injured her left knee.  (<u>Id</u>.) She was referred to an orthopedist on February 3, 2005. (R. at 500.)

4.   <u>Consultative Exams</u>

a.   <u>Robert Waters, Ph.D. – Psychological Evaluation</u>

On April 10, 2003, Dr. Waters performed a consultative mental status examination of Claimant.  (R. at 451.)  Claimant reported an inability to work due to a combination of depression and back problems.  (<u>Id</u>.)  Claimant indicated that she was not receiving any psychiatric/psychological services at the time of her evaluation, but that she had seen a therapist on a very sporadic basis over the previous three years.  (<u>Id</u>.)  The claimant indicated to Dr. Waters that she was able to do most

---

[1]  Bursitis is an inflammation of a bursa, a sac or sac-like cavity filled with a viscid fluid, occasionally accompanied by a clacific deposit in the underlying tendon.  <u>See</u> <u>Sloane-Dorland Annotated Medical-Legal Dictionary</u> 103 (1987).

household tasks, although with much pain.  (R. at 452.)  The
claimant indicated that she is able to shop despite difficulty
lifting due to pain.  (Id.)  She also admitted that she is able
to drive a car and drove to the evaluation.  (Id.) The claimant
reported no difficulty following instructions.  (Id.) Dr. Waters
observed Claimant to be obese with a slow gait that did not
evidence right or left sided weakness.  (R. at 452.)  Claimant's
speech was reported to be spontaneous and of normal rate and
volume and the claimant reported that she is "usually cheerful."
(Id.)  Dr. Waters noted that the claimant later indicated that
she tends to keep things inside and appeared tearful when
admitting this.  (R. at 453).  Claimant admitted to having
suicidal thoughts with no intent or plan and reported that she
wakes up every 2 to 3 hours a night.  (Id.)  She indicated that
her energy level is fair but she has lost interest in reading and
socializing.  (Id.)  However, she went on to explain that she has
little time for her own interests because she spends most of her
time with her children.  (Id.)  Dr. Waters further noted that (1)
Claimant reported no psychotic symptoms; (2) a mental status
examination revealed "mixed" attention; (3) Claimant was able to
repeat five digits forward but only three backwards and had
difficulty calculating serial sevens but was able to calculate
serial threes without difficulty; and (4) Claimant had a good

11

fund of knowledge and judgment was sound.  (Id.)  Dr. Waters diagnosed Claimant with dysthymic disorder and indicated that Claimant's "physical and mental status presents a formidable obstacle for her adapting to a typical work environment at this time." (R. at 453-54).

  b. Dr. Jack Dimarco – Orthopedic Examination

  On April 23, 2003, Dr. Dimarco conducted a consultative orthopedic examination of Claimant.  (R. at 455.)  Dr. Dimarco's evaluation report notes that Complainant reported (1) joint pain, which varies in location from day to day; (2) symptoms affecting the upper extremities; (3) weakness of right hand grip and some numbness in the right hand; (4) pain extending from the right hand up into the right side of her neck when engaging in activities such as playing cards; and (5) reluctance to have an EMG and nerve conduction studies performed because she does not like to have testing done.  (R. at 455-56.)

  Dr. Dimarco's physical examination of Claimant revealed a well-developed, well-nourished moderately obese female in no acute distress.  (R. at 456.)  The claimant had good range of motion of the neck, left shoulder, bilateral elbows and bilateral wrists but decreased active range of motion of the right shoulder.  (Id.)  She had good hand intrinsic strength bilaterally but had decreased grip strength in the right hand

12

when compared to the left. (Id.)  However, she was able to use
both hands for fine and gross manipulation.  (Id.)  Her
coordination and reflexes were intact and she had good strength
and active range of motion at both hips, knees and ankles.  (Id.)
There was no effusion or warmth of the knees and no edema of
either lower extremity.  (R. at 457.)  The claimant was able to
ambulate independently without a hand-held assistive device and
could walk on her toes and in a tandem gait but had difficulty
walking on her heels due to low back pain. (Id.)  The claimant
also had restricted forward flexion at the waist. (Id.)  There
was no significant tenderness or muscle spasm of the spinal area
but the claimant did report pain on straight leg raising.  (Id.)
Dr. Dimarco determined that the claimant may have polyarticular
arthritis, since she reported symptoms affecting multiple joints.
(Id.)  He also noted that the claimant has symptoms of sciatica
and a positive straight leg raising test and may have carpal
tunnel syndrome of the right hand.  (R. at 457.)  Dr. Dimarco
indicated that the claimant may have difficulty with prolonged
standing and walking and heavy lifting and is restricted from
climbing and balancing. (Id.)

        c.   State Agency Medical Reviewers

On May 28, 2003, a State Agency medical reviewer completed a
Mental Residual Functional Capacity Assessment and determined

13

that the claimant has some moderate mental limitations.  (R. 475-
77).  Specifically, the medical reviewer found that Claimant was
"Moderately Limited" in her ability to (1) understand and
remember detailed instructions, (2) carry out detailed
instructions, (3) maintain attention and concentration for
extended periods, (4) perform activities within a schedule,
maintain regular attendance, and be punctual within customary
tolerances, (5) complete a normal work day and workweek without
interruptions from psychologically based symptoms and to perform
at a consistent pace without an unreasonable number and length of
rest periods, and (6) interact appropriately with the general
public.  (R. at 475-76.)  The medical reviewer concluded the
evaluation by noting that Claimant's "overall mental impairment
appears moderate."  (R. at 477.)

On June 3, 2003, a second State Agency medical reviewer
completed a Physical Residual Functional Capacity Assessment and
indicated that the claimant can perform a full range of light
work.  (R. 479-86).  Specifically, the medical reviewer found
that Claimant could occasionally lift and/or carry twenty (20)
pounds, frequently lift and/or carry ten (10) pounds, stand
and/or walk (with normal breaks), or alternatively sit, for a
total of six (6) hours in a an 8-hour workday, and push and/or
pull to an unlimited extent, other than as shown for lift and/or

14

carry.  (R. at 480.)  In reaching his findings, the medical
reviewer took note of Claimant's "history of multiple joint
complaints," hypothyroidism, anemia, chronic leukocytosis,
obesity, polyarticular arthritis, high white blood cell count and
weight at the time of the assessment.  (R. at 480-81, 484.)  The
examiner did not find any manipulative, visual, communicative or
environmental limitations.  (R. at 482-83.)  However, the
examiner noted in the Additional Comments portion of his
assessment that "there is a psych issue," but did not further
elaborate.  (R. at 486.)

     5.   <u>Medical Expert – Dr. Brad Rothkopf</u>

On March 14, 2007, Dr. Brad Rothkopf, a medical expert,
testified that the medical evidence showed the following medical
impairments: (1) multiple orthopedic problems, including
sciatica, carpal tunnel syndrome, degenerative joint disease in
multiple joints, and rheumatoid arthritis; (2) morbid obesity;
(3) depression; (4) hypothyroidism; and (5) chronic leukocytosis
(elevated white blood cell count which yields no restrictions).
(R. at 161, 379.)

Dr. Rothkopf testified that he compared Claimant's multiple
impairments to orthopedic listings 1.01, 1.02A&B, and 1.04, and
he looked at the inflammatory arthritic rheumatoid listings from
14 to 1406, which he realized she does not have.  (R. at 164-65.)

He did not, however, compare depression to any listing because it is outside of his field of experience.  (R. at 166.)  Dr. Rothkopf indicated that in evaluating the combination of impairments, and factoring in obesity, Claimant's impairments did not meet or equal any of the listings.  (R. at 171-72.)  Because depression is outside his area of expertise, it was not factored into the analysis.  (R. at 172.)

At the hearing Dr. Rothkopf was asked whether he considered Dr. Lyden's chiropractic report.  (R. at 181.)  He testified that he had spent more time considering the examination of the consultative examiner than Dr. Lyden's report.  (Id.)  He further testified that Dr. Lyden's findings of bilateral cervical radiculopathy in the upper extremities and weakness of the right arm and rib cage were not supported by x-ray or other documentation and, therefore, did not list it as an impairment. (R. at 178.)  When asked directly to consider whether factoring in the bilateral cervical radiculopathy that the treating physician diagnosed and treated would result in a heightened or more severe level of impairment than indicated on his report, Dr. Rothkopf indicated that it would not.  (R. at 181).  Dr. Rothkopf opined in his testimony and interrogatories that Claimant is capable of sedentary work.  (R. at 173, 382.)

16

6.   <u>Vocational Evidence</u>

The vocational expert, Ted Mantegna, characterized Claimant's relevant work experience as follows: (1) medical assistant, light skilled work; (2) medical receptionist / billing clerk, sedentary, semi-skilled work; and (3) sales associate, sedentary, unskilled work.  (R. at 79.)  He further testified that transferable skills would primarily include computer skills and other skills associated with the medical industry.  (R. at 79-80.)

The vocational expert was asked by the ALJ to consider three hypothetical scenarios.  (R. at 81.)  The first hypothetical considered an individual with the same age, education, training and experience as Claimant but with limitations based upon Dr. Dimarco's Consultative Examination of April 2003.  (<u>Id</u>.)  These limitations include polyarticular arthritis; symptoms affecting multiple joints; problems of sciatica; a positive straight leg raising test; carpal tunnel syndrome of the right hand based upon a positive Tinel's sign, but Claimant is reluctant to have an EMG and nerve conduction testing performed; Claimant's report of her family physician having told her that a rheumatoid factor test was borderline positive; difficulty with prolonged standing, ambulation, and the lifting and carrying of heavy objects; and restrictions from any climbing and balancing activities.  (R. at

17

80-81.)  In response to this hypothetical, the vocational expert
stated that the information provided was "insufficient" because
it was not quantified.  (R. at 81.)

The second hypothetical required the vocational expert to
consider an individual with the mental limitations outlined in
the May 28, 2003 Mental Residual Functional Capacity Assessment.
(Id.)  These limitations include a moderately limited ability to
understand, remember, and carry out detailed instructions;
maintain attention and concentration for extended periods of
time; perform activities within a schedule; maintain regular
attendance and be punctual within customary tolerances; complete
a normal work day and work week without interruptions from
psychologically based symptoms and perform at a consistent pace
without an unreasonable number and length of rest periods;
interact with the general public due to depression.  (R. at 81-
82.)  In response to this hypothetical, the vocational expert
stated that such an individual could not return to past relevant
work and could not perform any jobs which exist in the regional
and national economy.  (R. at 82.)

The final hypothetical described an individual with the
physical limitations described in the June 3, 2003 Physical
Residual Functional Capacity Assessment.  (Id.)  These
limitations, due to polyarthritis and obesity, include an ability

18

to occasionally lift and/or carry twenty (20) pounds; frequently
lift and/or carry ten (10) pounds; stand and/or walk, or
alternatively sit, with normal breaks for a total of six (6)
hours in an eight-hour day; and an unlimited ability to push and
pull.  (Id.)  Additionally, such an individual has complained of
neck spasms and joint complaints.  The vocational expert stated
that the provided information is sufficient to draw an opinion
within a reasonable degree of professional certainty that a
hypothetical individual with such limitations could return to all
past relevant work.  (R. at 83.)

### C.   ALJ's Findings

On June 13, 2007, the ALJ issued a decision ruling that
Claimant was not disabled within the meaning of the Social
Security Act prior to December 31, 2001, the date last insured.[2]
(R. at 26.)  In reaching this decision, the ALJ proceeded through
the five-step analysis outlined in 20 C.F.R. § 404.1520.  (R. at
19-25.)

---

[2]  As the ALJ explained, and as both parties recognize, the
relevant time period for disability at issue in this appeal is
between September 1, 2000 and December 31, 2001.  (R. at 17)
("The claimant's earnings record shows that the claimant has
acquired sufficient quarters of coverage to remain insured
through December 31, 2001 . . . Thus, the claimant must establish
disability on or before that date in order to be entitled to a
period of disability and disability insurance benefits.").

First, the ALJ concluded that Claimant had not engaged in substantial gainful activity during the period from her alleged onset date of September 1, 2000 through her date last insured of December 31, 2001.  (R. at 19.)  Second, he held that Claimant suffered from bilateral cervical radiculopathy, a severe impairment occurring during the relevant time.  (Id.)  Third, he found that this impairment did not meet or medically equal the criteria of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  The ALJ noted that Claimant was diagnosed with adjustment disorder, anxiety and depressed mood in 1998, was prescribed Prozac in 1999 and again in April and August of 2001. (R. at 19.)  He determined, however, that there was not sufficient evidence available to establish that the impairment imposed work-related limitations prior to December 31, 2001, the date last insured.  (Id.)  According to the ALJ, Claimant had thus failed to prove the existence of a severe mental impairment prior to the date last insured.  (Id.)

The ALJ also considered the lack of medical evidence pertaining to Claimant's obesity.  (R. at 20).  The ALJ noted that, although the Claimant may be morbidly obese, as testified to by Dr. Rothkopf, "there is no indication that the claimant's obesity causes any functional limitations" or that "claimant's

obesity causes more pain that the claimant's cervical radiculopathy causes on its own." (Id.) In reaching this conclusion, the ALJ considered the medical evidence of record, the Claimant's subjective complaints, and the lack of evidence indicating that any physician had ever recommended that the Claimant lose weight in order to reduce her pain. (Id.)

Prior to step four, the ALJ found that Claimant retained the RFC to lift and/or carry twenty (20) pounds occasionally and ten (10) pounds frequently, sit for six (6) hours, and stand and/or walk for two (2) hours, but should avoid concentrated exposure to workplace hazards. (Id.) In reaching this finding, the ALJ noted, in detail, (1) Claimant's subjective physical complaints; (2) Claimant's testimony regarding her daily routines; (3) Claimant's subjective testimony stating that she could lift a gallon of milk, walk one-half of a block, stand for ten (10) minutes continuously and sit for thirty (30) minutes continuously, drive a car locally, and that she does not go shopping alone and is able to climb only a couple of stairs; (4) medical evidence of record establishing that Claimant has a long history of back pain; (5) the treatment records of Dr. J. Ross noting adjustment disorder, including anxiety and depressed mood; (6) the treatment notes of Dr. Ricigliano, Claimant's primary care physician; (7) the treatment notes of Dr. Lyden, Claimant's

chiropractor; (8) the treatment notes of Dr. Greenberg, an oncology and hematology expert; (9) Claimant's consultative mental status examination performed by Dr. Waters; (10) Claimant's consultative orthopedic examination performed by Dr. Dimarco; (11) both State Agency medical reviews conducted regarding Claimant's mental and physical limitations; (12) additional notes provided by Dr. Ricigliano subsequent to Claimant's date last insured; (13) and evaluations conducted by Regional Orthopedic Professional Association.  (R. at 20-23.)

The ALJ stated in his opinion that he considered the abovementioned evidence and found that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible, especially prior to the date last insured, December 31, 2001."  (R. at 24.)  The ALJ further stated that the

> record contains no indication that prior to December 31, 2001, the claimant was unable to carry out her activities of daily living.  In addition, there is no evidence regarding factors that precipitated or alleviated the claimant's pain.  The undersigned also notes that the claimant admitted that she had not undergone surgery, psychiatric treatment, physical therapy, epidural injections, acupuncture or pain management.  Furthermore, there is no evidence that the claimant underwent any medical imaging prior to the date last insured, and no evidence that she was examined by an orthopedist or other specialist prior to that date.  In addition, the undersigned notes that the claimant's primary care physician noted very few physical findings and examined the claimant only

22

sporadically despite continuously refilling the claimant's pain medications by phone.

(Id.)

The ALJ noted that he gave little weight to the opinion of Dr. Waters because (1) the opinion was rendered almost eighteen months after the date last insured and (2) Dr. Waters did not perform a physical examination of Claimant, but based his opinion on a combination of Claimant's physical and mental impairments. (R. at 24-25.)  Therefore, the ALJ found that "Dr. Waters' findings support only a mild to moderate limitation in the claimant's ability to maintain attention and concentration [and] that there is no evidence of record [to] indicate[] that this limitation was present prior to the date last insured." (R. at 25.)

The ALJ also gave little weight to the opinion of Dr. Dimarco because (1) Claimant was examined over one year past the date last insured and (2) Claimant complained of joint pain and Dr. Dimarco diagnosed polyarticular arthritis, but there was no evidence of record to indicate that Claimant was experiencing joint pain prior to the date last insured.  (Id.)

At step four of the analysis, the ALJ found that Claimant's past relevant work as a sales associate did not require the performance of work functions precluded by her RFC.  (R. at 25.)

23

Finally, he found that prior to her date last insured, December 31, 2001, Claimant was not prevented from performing her past relevant work and was, therefore, not disabled. (Id.)

## II.  DISCUSSION

### A.  Disability Defined

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not

disabled" is obtained.  20 C.F.R. § 404.1520(a).  The five-step process is summarized as follows:

> 1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."
>
> 2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."
>
> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."
>
> 4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."
>
> 5.    Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence. In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable

to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777.

**B.   Standard of Review**

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C.A §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993). "Substantial evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d at 1213. Thus, substantial evidence may be slightly less than a preponderance. See Hanusiewicz v. Bowen, 678 F. Supp. 474, 476 (D.N.J. 1988). Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the
> substantiality test if the [Commissioner] ignores, or
> fails to resolve, a conflict created by countervailing
> evidence.   Nor is evidence substantial if it is
> overwhelmed by other evidence - particularly certain
> types of evidence (e.g. that offered by treating

26

physicians) - or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court, however, does have a duty to review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a corresponding duty to facilitate the court's review: "Where the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Nevertheless, the district court is not "empowered to weigh the

evidence or substitute its conclusions for those of the fact-

finder." Williams, 970 F.2d at 1182.

Moreover, apart from the substantial evidence inquiry, a

reviewing court is entitled to satisfy itself that the

Commissioner arrived at her decision by application of the proper

legal standards. Friedberg v. Schweiker, 721 F.2d 445, 447 (3d

Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J.

1981).

**C.   Analysis**

1.   <u>Whether the ALJ Failed to Follow Social Security
     Ruling 83-20</u>

Claimant argues, and the Court agrees, that the ALJ's

determination that the onset of Claimant's mental health

impairments post-dated the date Claimant was last insured did not

"have a legitimate medical basis," and was not consistent with

Social Security Ruling 83-20 ("SSR 83-20").  In this case, as the

Court now explains, the ALJ "should [have] call[ed] on the

services of a medical advisor" to determine the date of onset of

Claimant's mental impairments, SSR 83-20, and the Court will

accordingly remand this matter in order for the ALJ to consider

the testimony of such a medical advisor.

28

The SSA's regulations provide that Social Security Rulings "are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1); see also Walton v. Halter, 243 F.3d 703, 708 (3d Cir. 2001).  SSR 83-20 "recognizes that with slowly progressive impairments, including mental impairments, 'it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.'"  Spellman v. Shalala, 1 F.3d 357, 361 (5th Cir. 1993) (quoting SSR 83-20) (cited approvingly in Walton, 243 F.3d at 709) (emphasis added).  The Ruling accordingly provides:

> In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established.
>
> Precise Evidence Not Available--Need for Inferences
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

SSR 83-20 (emphasis added).

29

In recognition of the fact that "[i]n many claims, the onset date is critical," id., courts have consistently held that

> in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date, SSR 83-20 requires that that inference be based on an informed judgment. The Secretary cannot make such an inference without the assistance of a medical advisor.

Spellman, 1 F.3d at 364 (emphasis added); see also DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.").  The Court of Appeals for the Third Circuit is no exception, having held in Walton that "SSR 83-20 and the substantial evidence rule dictate . . . that an ALJ in a situation of this kind must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence."  243 F.3d at 709 (citing numerous cases so holding, emphasis added).

In this case, the ALJ recognized that two doctors who evaluated Claimant in 2003 determined that Claimant suffered from mental impairments, including "depression [and] [d]ysthmic disorder."  (R. at 453-54, 477.)  According to the testimony of

the vocational expert consulted by the ALJ, a person with the
array of mental impairments described by Dr. Flaherty could not
perform any jobs in the regional or national economy.[3]   (Id. at
82.)   While neither of the two doctors identified the precise
onset date of Claimant's mental impairments (or the date when
such impairments may have become disabling), both recognized that
Claimant had been suffering from such conditions for a
substantial period of time, with Dr. Waters describing Claimant's
depression as a "longstanding . . . obstacle," (id. at 453)
(emphasis added), and Dr. Flaherty explaining that Claimant's
depression "appears to be chronic."   (Id. at 477) (emphasis
added).   Notwithstanding this evidence indicating that Claimant
had potentially disabling, long-term mental impairments with an
indefinite onset date, the ALJ, based apparently "on his own lay
analysis of the evidence," Walton, 243 F.3d at 709, concluded
that the onset of Claimant's depression and other mental
impairments post-dated December 31, 2001, opining that "there is
no evidence of record that indicates that this limitation was
present prior to the date last insured."   (R. at 25.)

---

[3]   Thus, if Claimant suffered from the impairments
identified by Dr. Flaherty during the relevant period at issue in
this matter, a finding of disability at the final step of the
Commissioner's five-step analysis would appear to have been
called for.   See 20 C.F.R. § 404.1520(b)-(f).

This determination falls short on two accounts.  First, the ALJ's conclusion that there was "no evidence of record," (id.), to suggest that Claimant's mental impairments pre-dated the date last insured is not accurate.  Not only was Claimant prescribed the antidepressant Prozac in 1999, (id. at 429), but as early as 1998, she visited a psychologist, Dr. J. Ross, who rendered a diagnosis of adjustment disorder with anxiety and depressed mood. (Id. at 384); see Ogden, 677 F. Supp. at 278 (explaining that the ALJ "must adequately explain in the record his reasons for rejecting or discrediting competent evidence").  Equally important is the impact of SSR 83-20 upon the record in this matter, in which the precise onset date of Claimant's mental impairments, and the date when such impairments may have become disabling, (R. at 82), are ambiguous.  In light of the fact that "the medical evidence is not definite concerning the onset date" of Claimant's mental impairments, "SSR 83-20 require[d] the administrative law judge to call upon the services of a medical advisor . . . to make the determination."  DeLorme, 924 F.2d at 848 (cited approvingly in Walton, 243 F.3d at 709).[4]  The ALJ in

---

[4]  While the ALJ in this matter did hear the testimony of a medical advisor, Dr. Rothkopf, on the impact of Claimant's obesity upon her capacity to work, Dr. Rothkopf expressly declined to "say anything about depression because . . . it's outside of [his] field."  (R. at 172.)  Dr. Rothkopf's testimony thus offered the ALJ no guidance as to the onset date of Claimant's depression and other mental impairments.

this case inferred that the onset date of Claimant's mental impairments post-dated December 31, 2001 without "the services of a medical advisor," a determination that ran contrary to SSR 83-20's requirement that such retroactive inferences "have a legitimate medical basis."  SSR 83-20.

The Commissioner's argument to the contrary is not convincing.  According to the Commissioner, because "the voluminous administrative record is made up primarily of medical reports," this is not a case in which the absence of medical records made an inference as to the disability onset date necessary.  (Def.'s Br. at 17.)  But courts have long recognized that SSR 83-20 applies not only in the total absence of medical records but also where "the medical evidence is <u>ambiguous</u> and a retroactive inference [as to the onset date of a progressive impairment] is necessary."  <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1201 (8th Cir. 1997) (cited approvingly in <u>Walton</u>, 243 F.3d at 709) (emphasis added); <u>see also</u> <u>Spellman</u>, 1 F.3d at 362 (recognizing applicability of SSR 83-20 where medical records exist but are ambiguous as to the onset date of a progressive impairment); <u>DeLorme</u>, 924 F.2d at 848 (same).  Moreover, and perhaps more to the point, while the administrative record in this matter is indeed voluminous, the documentation of Claimant's mental impairments, and the progression from Claimant's diagnosis

33

of adjustment disorder with anxiety and depressed mood in 1998, (R. at 384), to Claimant's potentially disabling mental state in 2003, (id. at 82, 453-54, 477), is sketchy at best.  In other words, this is a case in which "adequate medical records are not available," SSR 83-20, because the records that are available do not speak to the onset date of Claimant's mental impairments.

Because "in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date, SSR 83-20 requires that that inference be based on an informed judgment," Spellman, 1 F.3d at 364, the Court will vacate the Commissioner's decision and require that the ALJ "call on the services of a medical advisor," SSR 83-20, to assist him in inferring the onset date of Claimant's depression and other mental impairments.

### 2.   Claimant's Residual Functional Capacity

The Court's determination, supra, that the ALJ should have called upon the services of a medical advisor to assess the onset date of Plaintiff's mental impairments will necessarily require the ALJ, upon remand, to reevaluate Claimant's RFC in light of the medical advisor's testimony.  That is, to the extent that the medical advisor's testimony reveals that Claimant's mental impairments, even if not severe, limited her ability to work

34

during the relevant time period, the ALJ must account for such limitations in reevaluating Claimant's RFC.[5]  See SSR 96-8p.

For the following reasons, the Court likewise finds that the ALJ failed to adequately explain his determination that Claimant's obesity did not cause any functional limitations in determining Claimant's RFC.  The Court accordingly instructs the ALJ to account for the functional effects of Claimant's obesity, in addition to any information about Claimant's mental impairments gleaned from the medical advisor's testimony, when reevaluating her RFC upon remand.  However, as the Court explains below, it finds that the ALJ's determination that Claimant did

---

[5]  In evaluating Claimant's RFC, the ALJ appears to have disregarded evidence of Claimant's mental impairments – including the reports of Dr. Waters and Dr. Flaherty – because he concluded that Claimant was not so impaired during the relevant time period.  (R. at 25.)  As the Court has already explained, because SSR 83-20 requires that such retroactive inferences regarding the onset date of progressive impairments "have a legitimate medical basis," SSR 83-20, the ALJ's conclusion on this point is not supported by substantial evidence.  The only additional reason the ALJ articulated for disregarding Dr. Waters' report was that Dr. Waters, a psychologist, did not conduct a physical examination of Claimant.  (Id.)  This is not an adequate explanation for disregarding Dr. Walters' opinions about Claimant's mental impairments.  The Court is aware of no authority suggesting that a psychologist's opinions regarding a patient's mental health may be disregarded because the psychologist did not perform a physical examination; indeed, a licensed psychologist may not be authorized by law to conduct a medical examination of a patient.  See N.J.S.A. 45:14B-4 ("Nothing in [the Practicing Psychology Licensing Act] shall authorize the practice of medicine and surgery by any person not licensed so to do pursuant to chapter 9 of Title 45 of the Revised Statutes.").

not suffer from degenerative joint disease during the relevant time period is supported by substantial evidence, and declines to instruct the ALJ to reconsider this determination upon remand.[6]

a. Assessment of Residual Functional Capacity

The sequential evaluation process for determining disability requires an assessment of the claimant's functional limitations and her remaining capacities for work-related activities, referred to as the claimant's residual functional capacity ("RFC"). See SSR 96-8P. A claimant's RFC represents her maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.[7] Id. The RFC assessment is a function-by-function assessment based upon the relevant evidence of the claimant's ability to do work-related activities. Id. A function-by-function assessment includes an

---

[6] Initially, the Court notes its disagreement with Claimant's suggestion that the ALJ could not rely upon the testimony of Dr. Rothkopf in evaluating Claimant's RFC because Dr. Rothkopf failed to account for the report of Claimant's chiropractor, Dr. Lyden, in rendering his opinion. See Social Security Administration, Office of Hearings and Appeals, Litigation Law Manual I-2-5-39(A) (noting that an ALJ must ensure that a medical expert "has examined all medical and other evidence of record"). Dr. Rothkopf's testimony evidences a reasoned disagreement with Dr. Lyden's opinion, not a disregard for that opinion. (R. at 181.) Because Dr. Rothkopf adequately accounted for Dr. Lyden's opinions, the ALJ committed no error in relying upon Dr. Rothkopf's testimony.

[7] A "regular and continuing basis" means eight hours per day for five days a week, or an equivalent work schedule. See SSR 96-9P.

assessment of a plaintiff's physical abilities, mental abilities, and any other abilities affected by his impairments and how limitations regarding those abilities may affect his ability to do work on a regular and continuing basis.  20 C.F.R. §§ 416.945(b)(c)(d), 404.1545(b)(c)(d).   The assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  Id.

The assessment of the claimant's RFC is used at Steps Four and Five of the sequential evaluation process to determine whether the claimant is able to do past relevant work or other work which exists in the national economy.  Id.  The ALJ must consider all relevant evidence when determining an individual's residual functional capacity at Step Four, see Fargnoli v. Halter, 247 F.3d 34, 41 (3d Cir. 2001), and must consider limitations imposed by all of an individual's impairments, even those that are not "severe."  See SSR 96-8.  Such evidence includes medical records, lay evidence, effects of symptoms, including pain that are reasonably attributed to a medically determinable impairment, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  Fargnoli, 247 F.3d at 41; see also SSR 96-9p.  Additionally, the ALJ's findings of residual functional

capacity must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Cotter, 642 F.2d at 704.

> b.   The ALJ's Determination of Claimant's
> Residual Functional Capacity

As the Court explained, supra, it agrees with Claimant that the ALJ's conclusion regarding the onset date of Claimant's mental impairments is not supported by substantial evidence, and that this error rendered deficient the ALJ's assessment of Claimant's RFC.  For the following reasons, the Court likewise finds that the ALJ's determination that Claimant's obesity had no impact upon her RFC is not supported by substantial evidence, and will instruct the ALJ upon remand to reevaluate the impact of this condition upon Claimant's capacity to work.

In considering the impact of Claimant's obesity upon her RFC, the ALJ concluded that "there is no indication that the claimant's obesity causes any functional limitations." (R. at 20.)  The only evidence identified by the ALJ in support of this conclusion was the testimony of Dr. Rothkopf, the medical expert who testified about the impact of Claimant's obesity upon her capacity to work after the ALJ's initial decision was vacated by the Appeals Council.[8]  (Id.)  As Claimant argues, however, while

---

[8]  In his initial decision, the ALJ did not account for the effect of Claimant's obesity upon her RFC, a shortcoming which

38

Dr. Rothkopf opined that Claimant's obesity, in combination with her bilateral cervical radiculopathy, did not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 under Step Three of the sequential analysis, (id. at 172), he did not opine that Claimant's obesity had no impact on her functional capacity.  To the contrary, Dr. Rothkopf testified that Claimant's obesity would exacerbate several of her existing impairments: "[I]t's going to make her back pain worse.  It's going to make her knee pain worse.  I mean being severely overweight is a problem because it impacts virtually on all orthopedic conditions from the waste down pretty much."  (Id. at 170.)  Because the ALJ has not "sufficiently explained" his reason for concluding that Claimant's obesity causes no functional limitations, Gober, 574 F.2d at 776, in light of Dr. Rothkopf's testimony to the contrary, his conclusion on this point is not supported by substantial evidence, and must be reconsidered upon remand.[9]

---

prompted the Appeals Council to vacate the ALJ's initial decision and instruct the ALJ to "provide an evaluation of the severity and functional effects, if any, of the claimant's obesity."  (R. at 199.)

[9]  It is likewise significant that Dr. Rothkopf concluded, in light of Claimant's morbid obesity, that Claimant was "limited to sedentary work."  (R. at 382.)  The definition of "sedentary work" in SSR 96-9P notes that "sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small

Finally, the Court finds that the ALJ's determination, in evaluating Claimant's RFC, that Claimant did not suffer from impairments causing joint pain between September 1, 2000 and December 31, 2001 is supported by substantial evidence, and declines to instruct the ALJ to reconsider this determination upon remand. While Claimant appears to have experienced joint pain in 2003, long after the date she was last insured in 2001, the ALJ concluded that there was no indication from Claimant's medical records that she "was experiencing joint pain prior to the date last insured," and accordingly did not factor arthritis and related impairments into his evaluation of Claimant's RFC. (R. at 25.) The Court has reviewed Claimant's medical records from 2000 to 2001 and has not found any evidence to suggest that Claimant was diagnosed with, or treated for, arthritis or degenerative joint disease during the relevant time period.[10]

---

tools." SSR 96-9P (emphasis added). In his decision, the ALJ, apparently relying upon the Physical Residual Functional Capacity Assessment, (R. at 479), concluded that Claimant was occasionally able to lift twenty pounds. (R. at 20.) Upon remand, the ALJ should reconcile this finding with Dr. Rothkopf's conclusion. See Ogden, 677 F. Supp. at 278 (noting that if an ALJ is "faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence").

[10] The ALJ's well-supported conclusion with regard to Claimant's alleged joint disease is thus to be distinguished from his approach to Claimant's mental impairments. While the evidence of record at minimum suggests that Claimant may have been restricted, if not disabled, by her mental impairments prior

The Court accordingly finds that the ALJ's conclusion regarding Claimant's joint pain is supported by substantial evidence.

Claimant's arguments to the contrary do not detract from the Court's conclusion. Claimant draws the Court's attention to the office notes of Dr. Ricigliano, Claimant's primary care physician, and, in particular, Dr. Ricigliano's prescription of the painkillers Hydrocodone and Vicodin on various occasions between July 5, 2000 and December 27, 2001. (Id. at 404, 419, 421-22.) Claimant appears to argue that the mere fact that she was prescribed pain medication for unspecified reasons in 2000 and 2001 undermines the ALJ's finding that Plaintiff did not suffer from arthritis and related impairments during the relevant time period. The Court cannot agree. There appears to be no mention of the words "arthritis" or "joint disease" in Claimant's medical records prior to 2003. By contrast, Plaintiff did suffer from pain-causing impairments between 2000 and 2001, such as bilateral cervical radiculopathy, which the ALJ recognized to be a severe impairment. (R. at 19.) The mere fact that Plaintiff was prescribed pain medication during the relevant time period does not detract from the ALJ's conclusion that Claimant did not

---

to the date last insured, (R. at 384, 453, 477), there is no such evidence that Claimant suffered from arthritis or any condition causing joint pain between September 1, 2000 and December 31, 2001.

suffer from arthritis or other joint-affecting ailments between 2000 and 2001, in the complete absence of evidence suggesting that Claimant was treated for such conditions during that period.

In summary, the Court finds that the ALJ's determination that Claimant's mental impairments and obesity did not impact her RFC is not supported by substantial evidence, and will remand this matter in order for the ALJ to reevaluate Claimant's RFC in light of the limitations imposed by these impairments.  The Court finds no error in the ALJ's determination that Claimant was unaffected by arthritis or degenerative joint disease during the relevant period, and declines to instruct the ALJ to reconsider this matter in his RFC assessment on remand.

## III. CONCLUSION

For the reasons stated above, the Court will remand this matter to the ALJ with instructions to (1) call on the services of a medical advisor in order to determine the onset date of Claimant's mental impairments in accordance with SSR 83-20, (2) reevaluate Claimant's RFC in light of any information about Claimant's mental impairments during the relevant time period that may be gleaned from the medical advisor's testimony, and (3) take into account the restrictions Claimant's morbid obesity placed upon her capacity to work during the relevant time period

42

when reassessing Claimant's RFC.  The accompanying Order will be
entered.


**December 8, 2008**                      **_s/ Jerome B. Simandle_**
DATE                                      JEROME B. SIMANDLE
                                          United States District Judge

43